UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

CURRENCY $96,770,

    Defendant,

DORU BOBBY MOISE &
ROMA HARVEST INTERNATIONAL
MINISTRIES,

    Claimants.

_____/

Case No. 16-cv-11185

UNITED STATES DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

UNITED STATES MAGISTRATE JUDGE
STEPHANIE DAWKINS DAVIS

**OPINION AND ORDER DENYING CLAIMANTS' MOTION TO TRANSFER VENUE [18]
AND DENYING CLAIMANTS' MOTION FOR A PROTECTIVE ORDER [17]**

**I. INTRODUCTION**

On April 1, 2016, Plaintiff United States of America ("the Government")
filed a Complaint for Forfeiture, based on currency seized by officers at the Detroit
Metropolitan Airport. Dkt. No. 1, pp. 1–2 (Pg. ID No. 1–2). Thereafter, Claimants
Doru Bobby Moise and Roma Harvest International Ministries received four
extensions to file claims and answers to the Complaint. *See* Dkt. No. 4–11.

On November 16, 2016, Claimants filed a Motion for a Protective Order, Dkt. No. 17, and a Motion to Transfer Case to the United States District Court for the Central District of California, pursuant to 28 U.S.C. § 1404(a), Dkt. No. 18.

These motions are fully briefed and a hearing was held on December 19, 2016. For the reasons discussed herein, the Court will **DENY** Claimants' Motion to Transfer Venue [18] and **DENY** Claimants' Motion for a Protective Order [17].

## II. BACKGROUND

On November 5, 2015, a United States Department of Homeland Security, Customs and Border Protection ("Customs") officer was conducting outbound currency inspections at the Detroit Metropolitan Airport in Romulus, Michigan. Dkt. No. 1, p. 24 (Pg. ID No. 4). Afrodita Chiciu and her traveling companion, Ana Rios, were ticketed passengers on Delta Airlines Flight No. 98 traveling to Paris, France with a final destination to Romania. *Id*. A Customs officer approached Chiciu and Rios for purposes of conducting a currency inspection. *Id*. The first time that the Customs officer asked Chiciu how much money she was transporting, Chiciu responded that she had $10,000. *Id*.

The Customs officer then referred Chiciu and Rios to secondary inspection to search their persons and baggage more thoroughly. *Id*. Chiciu then professed a lack of knowledge with the English language. *Id*. During secondary inspection, Rios provided translation assistance to Chiciu. *Id*. Customs officers explained the

currency reporting requirements to Rios, who acknowledged that she understood the requirements, and then Rios translated the U.S. currency requirements to Chiciu. *Id*. Chiciu affirmed her understanding of the currency reporting requirements and restated to Customs officers that she was transporting $10,000. *Id*. at 4–5.

Customs officers asked Chiciu to clarify her previous response, and Chiciu stated she had "a little more" than $10,000. *Id*. at 5. When Customs officers asked Chiciu to specify the exact amount of currency in her possession, she verbally declared $30,000. *Id*. Following the verbal declarations, Customs officers presented Chiciu with Financial Crimes Enforcement Network ("FINCEN") Form No. 105. *Id*. On that form, Chiciu changed her previous declarations and made a written declaration in the amount of $90,000. Rios declared $500.00 in writing on FINCEN Form No. 105. *Id*.

Customs officers then examined the carry-on bags belonging to Rios and Chiciu. *Id*. Inside Rios's carry-on bag, Customs officers discovered $26,500, which was not properly reflected on Rios's currency reporting document. *Id*. Inside Chiciu's carry-on bag, Customs officers discovered $96,770, which was not properly reflected on Chiciu's reporting document. *Id*. The Government alleges that once the currency was discovered, Chiciu became very agitated and told Customs officers that she has high blood pressure. *Id*. Customs then provided

Chiciu with an airport wheelchair, which she accepted, although she declined the Customs' offer to seek medical attention on her behalf. *Id*. Minutes later, Chiciu allegedly abandoned the wheelchair, picked up her belongings, and began talking excitely to Rios in Romani. *Id*. at 5–6.

A Customs supervisory officer notified Delta Airlines personnel that Rios and Chiciu would not be flying on Delta Airlines Flight No. 98 and requested that their checked in luggage be removed from the plane and taken directly to the Federal Inspection Station. *Id*. at 6. Chiciu and Rios were escorted to the Federal Inspection Station for further investigation. *Id*. While there, Chiciu and Rios initially denied to Customs officers that Chiciu had given Rios any currency. *Id*. After further questioning, Chiciu and Rios changed their original explanation and told Customs officers that while they were traveling to the airport, Chiciu gave Rios $10,200 to carry in her possession. *Id*.

Based on the inspection and inconsistent statements made by Chiciu and Rios, Customs officers determined that both passengers were attempting to transport $123,270 in U.S. Currency from the United States to Romania. *Id*. Customs officers returned $3,270.00 to Rios for humanitarian reasons. Officers seized the remaining $120,000 for failure to accurately report the transportation of currency pursuant to 31 U.S.C. § 5316(a)(1). *Id*. The Government does not seek forfeiture of the $26,500 in United States Currency seized from Rios. *Id*.

## III. DISCUSSION

### A. Claimants' Standing

The Court must first address the issue that the Government raised in its response briefs. *See* Dkt. No. 20, pp. 18–21 (Pg. ID No. 287–90). The Government contends that Claimants' factual assertions are unsupported by the record and that "[t]heir tie to the defendant currency remains speculative." *Id.* at 21. Thus, according to the Government, because Claimants have not yet demonstrated standing to contest the forfeiture, the issues presented to the Court are not ripe for a decision. *See id.*

In order to contest a governmental forfeiture action, claimants must have statutory standing through compliance with Rule C(6) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, as well as the Article III standing required for any action brought in federal court. *See United States v. Currency $267,961.07*, 916 F.2d 1104, 1107 (6th Cir. 1990). Rule C(6) provides:

> The claimant of property that is the subject of an action in rem shall file a claim within 10 days after process has been executed, or within such additional time as may be allowed by the court, and shall serve an answer within 20 days after the filing of the claim. The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action. If the claim is made on behalf of the person entitled to possession by an agent, bailee, or attorney, it shall state that the agent, bailee, or attorney is duly authorized to make the claim.

*Id.*

For Article III standing, "a claimant must have a colorable ownership, possessory or security interest in at least a portion of the defendant property." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 497 (6th Cir. 1998). "Article III's standing requirement is thereby satisfied because an owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the seized property." *Id.* To establish standing, claimants need only claim a facially colorable interest in the seized property, not prove the merits of their underlying claim. *Id.* at 487–98.

An ownership interest is the most obvious type of interest in seized property that constitutes a colorable claim. *Id.* at 498. However, "[a] property interest less than ownership may also be sufficient to create standing." *Id.* Even possessory interests may be sufficient to bestow standing to contest a forfeiture. *Id.* Nevertheless, "naked possession" claims are insufficient to establish standing. *Id.* Instead, claimants must provide some explanation or contextual information regarding their relationship to the seized property. *Id.* Factual allegations should include how the claimants came to possess the property, the nature of the claimants' relationship to the property, and/or the story behind the claimants' control of the property. *Id.*

To contest a forfeiture action, claimants bear the burden of demonstrating an interest in the seized item sufficient to satisfy the Court of their standing as claimants. *Id.* However, the Sixth Circuit has "decline[d] to adopt any type of hard-and-fast requirement for the initial evidentiary showing necessary for standing." *Id.*

The Government may challenge whether claimants' interest in defendant property is sufficient to confer standing by questioning the claimants' factual allegations and developing information through interrogatories to determine whether the claimants have a real interest in the property. *Id.* at 499. Article III merely requires that claimants allege a personal stake in the controversy's outcome, such as an actual or threatened injury. *Id.*

Here, Claimants have taken the essential step of asserting a property interest in the defendant currency. The question then becomes whether Claimants have provided sufficient proof of their property interests to establish standing so that their motions may be properly considered. The Court will consider pleadings, answers to interrogatories, and admissions in the file.

In its Complaint, the Government alleged that $96,770 in United States Currency was seized by officers of the United States Department of Homeland Security, Customs and Border Protection ("Customs") on November 5, 2015 at the Detroit Metropolitan Airport in Romulus, Wayne County, Michigan. Dkt. No. 1, p. 2 (Pg. ID No. 2). The Government also alleges in its Complaint that the money was

seized from Chiciu because she failed to accurately report the transportation of currency pursuant to 31 U.S.C. § 5316(a)(1) while attempting to transport $123,270 in U.S. Currency from the United States to Romania. *Id*. at 3.

In their filings, Claimants assert that they own the entirety of the defendant currency, which they raised from charitable donations. Dkt. No 17-3, p. 4 (Pg. ID No. 150). The funds were allegedly earmarked to renovate a church and support local missionaries in Romania. *Id*. Claimants further allege that Chiciu was Claimants' bailee. *Id*.

Claimants have filed a Seized Asset Claims Form and have pled sufficient allegations to establish a personal stake in the controversy's outcome. Further, the Government has not suggested any conceivable alternative owners of the currency who have filed claims. In the Court's estimation, Claimants' assertion of ownership and explanation of Chiciu's possession of the currency, together with their answer to the Government's Complaint and compiled exhibits, are sufficient to establish their standing.[1]

---

[1] The Government notes that Claimants filed only an unsworn affidavit in support of their allegations of ownership. Dkt. No. 20, p. 17 (Pg. ID No. 286). However, the Seized Asset Claim Form Claimants' counsel submitted as part of Claimants' reply briefs does appear to be properly sworn according to Department of Justice claim form templates. *See* Dkt. No. 25-5, p. 2 (Pg. ID No. 476); http://www.forfeiture.gov/Claim%20Form%20(PDF).pdf. Thus, the Court will consider this declaration in its decision.

-8-

The facts pled by Claimants, while not conclusively establishing Claimants' ownership of the currency, are sufficient to demonstrate facially colorable claims to the property. Accordingly, the Court finds that Claimants have sufficient standing under Rule C(6) and Article III to contest the forfeiture.

### B. Claimants' Motion to Transfer Venue

Next, the Court will address Claimants' motion seeking to have the case transferred to the United States District Court for the Central District of California. Dkt. No. 18. The Government objects to Claimants' motion. Dkt. No. 20.

Generally, venue for a civil action is proper in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). A forfeiture action may be brought in "(A) the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred, or (B) any other district where venue for the forfeiture action or proceeding is specifically provided for in section 1395 of this title or any other statute." 28 U.S.C. § 1355(b)(1). Pursuant to section 1395, the venue of a forfeiture

action is also proper in the district where the claim accrues or the defendant is found, or where the property is found or brought. 28 U.S.C. § 1395(a)–(c).

Title 28, United States Code, Section 1404(a) governs change of venue and provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The transfer statute grants district courts broad discretion to determine when a transfer of venue is appropriate. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). The moving party bears the burden of proving by a preponderance of the evidence that the court should transfer the action. *Amphion, Inc. v. Buckeye Elec. Co.*, 285 F. Supp. 2d 943, 946 (E.D. Mich. 2003).

The district to which the movant proposes transfer must be one in which the case could have been properly brought. *Van Dusen v. Barrack*, 376 U.S. 612, 634 (1964). Once the movant meets this threshold requirement, "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.' " *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991).

This district has interpreted that the following factors should be considered:

(1) the convenience to the parties; (2) the convenience of witnesses; (3) the relative ease of access to sources of proof; (4) the availability

-10-

of process to compel attendance of unwilling witnesses; (5) the cost of obtaining willing witnesses; (6) the practical problems indicating where the case can be tried more expeditiously and inexpensively; and (7) the interests of justice.

*Grand Kensington, LLC v. Burger King Corp.*, 81 F. Supp. 2d 834, 836 (E.D. Mich. 2000). Public interest factors generally include the following considerations: "(i) the enforceability of the judgment; (ii) practical considerations affecting trial management; (iii) docket congestion; (iv) the local interest in deciding local controversies at home; (v) the public policies of the fora; and (vi) the familiarity of the trial judge with the applicable state law." *United States v. Currency $41,180.97 In the Form of Charter One/Citizens Bank Official Check No. 500738627-8*, No. 13-CV-14274, 2014 WL 4374372, at *3 (E.D. Mich. Sept. 4, 2014) (quoting *Steelcase, Inc. v. Smart Techs., Inc.*, 336 F. Supp. 2d 714, 720 (W.D. Mich. 2004); *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879–80 (3d Cir. 1995)).

Courts also consider Plaintiff's choice of forum as a significant factor when balancing the parties' interests. *See id.*; *Van Dusen*, 376 U.S. at 633–34 ("There is nothing, however, in the language or policy of § 1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs who have chosen a forum which, although it was inconvenient, was a proper venue.").

### 1.  Whether the Case Could Have Been Properly Brought in the Central District of California

It is undisputed that venue properly lies in the Eastern District of Michigan under 28 U.S.C. § 1391(b) or 28 U.S.C. § 1355.

However, Claimants assert that the case could have been brought in the Central District of California under 18 U.S.C. § 981(h), which states:

> In addition to the venue provided for in section 1395 of title 28 or any other provision of law, in the case of property of a defendant *charged with a violation that is the basis for forfeiture of the property* under this section, a proceeding for forfeiture under this section may be brought in the judicial district in which the defendant owning such property is found or in the judicial district in which the criminal prosecution is brought.

18 U.S.C. § 981(h) (emphasis added); Dkt. No. 25, p. 6 (Pg. ID No. 414). Section 981(h) is inapplicable to the instant proceedings because the present case is not one in which "a defendant [was] charged with a violation that is the basis for forfeiture of the property." *Id. See also Contents of Account No. 03001288 v. United States*, 344 F.3d 399, 404 (3d Cir. 2003) (noting that Section 981(h) grants venue "in the district where a related criminal action is pending"); *United States v. Akers*, 215 F.3d 1089, 1107 (10th Cir. 2000) (noting that section 981(h) provides jurisdiction in relation to other criminal proceedings). There is no evidence in the record that Chiciu was charged with a criminal violation in relation to the improperly reported currency. Section 981(h) does not apply to Claimants' case.

Additionally, it is unclear whether jurisdiction would properly lie in the Central District of California under 28 U.S.C. § 1391(b) or 28 U.S.C. § 1355. Los Angeles was the initial departure point in Chiciu's flight to Romania; however, it was not the act of flying with a large amount of currency that gave rise to the forfeiture in the present case. Rather, it was Chiciu's failure to file a valid report when exporting the currency outside of the United States. 31 U.S.C. § 5316(a)(1) ("[A] person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—(A) from a place in the United States to or through a place outside the United States"). The point at which the violation giving rise to forfeiture occurred was when Chiciu knowingly was about to transport more than $10,000 from a place in the United States to a place outside of the United States without filing a proper report. Detroit Metropolitan Airport was the point at which she was advised of the currency reporting requirements, the place at which she lied on the currency report, and the last domestic leg in her travels prior to landing in Paris, France.

It is far from clear that "a substantial part of the events or omissions giving rise to the claim occurred" in the Central District of California. Claimants have not alleged that Chiciu failed to file a truthful report about her knowing transport of currency in Los Angeles, as it is unclear whether she was required to file the report

at the first, domestic leg of her flight. *See* 31 U.S.C. § 5316 ("A report under this section shall be filed at the time and place the Secretary of the Treasury prescribes.").

Even if the Court were to assume that "a substantial part of the events or omissions giving rise to the claim occurred" in the Central District of California, a balance of the interests in this case indicates that venue should remain in the Eastern District of Michigan.

### a. Convenience of the Parties

When balancing the private interests of the parties in this litigation, the Court weighs seven factors. *See Grand Kensington*, 81 F. Supp. 2d at 836. First, the Court considers the convenience of the parties. *Id*. Claimants argue that the convenience of the parties favors transferring this case to California where Claimant Moise is a resident and where Claimant Roma is based. Dkt. No. 18, p. 12 (Pg. ID No. 259). The Government asserts that it is only authorized to appear on behalf of the United States in this district, and that authorization would be needed from the United States Attorney for the Central District of California to continue representation there. Dkt. No. 20, p. 13 (Pg. ID No. 282). While Claimants may be inconvenienced by continuing the case in this proper forum, the Government may be inconvenienced by transferring the case to California. Accordingly, the parties' inconvenience does not weigh strongly in favor of, or against, Claimants' motion.

-14-

Any inconvenience that Claimants may experience is insufficient to overcome the presumption in favor of Plaintiff's choice of venue.

### b. Convenience to the Witnesses

Second, the Court considers the convenience of the witnesses. *See Grand Kensington*, 81 F. Supp. 2d at 836. "Witnesses' convenience is one of the most important factors in determining whether to grant a motion to change venue under § 1404(a)." *Thomas v. Home Depot, U.S.A., Inc.*, 131 F. Supp. 2d 934, 937 (E.D. Mich. 2001). Claimants assert that this factor favors transfer because all of their witnesses, including Chiciu, Rios, and Claimant Moise, reside in California. Dkt. No. 18, pp. 12–13 (Pg. ID No. 259–60). Additionally, in the event that Claimant's charitable donors must be asked to testify, Claimants state that all their donors are located in California. *Id*. at 14. Claimants do not provide an outline of the material that their key witnesses will provide, which undermines their position because "[o]nly when the Court is armed with such information can it properly assess the convenience of the witnesses." *Home Depot*, 131 F. Supp. 2d at 937 (citation omitted).

Meanwhile, the Government anticipates calling multiple witnesses involved in the currency seizure, all of whom reside and are employed in Michigan. Dkt. No. 20, p. 13 (Pg. ID No. 282). Given that multiple witnesses reside in both the

-15-

Central District of California and the Eastern District of Michigan, this factor does not weigh in favor of transfer.

Additionally, Claimants allege that the cost of flying multiple witnesses to Michigan would render their case "more challenging." Dkt. No. 18, pp. 14 (Pg. ID No. 261). The Court may consider the "the relative financial strength of the parties," but such a consideration should be substantiated with evidence. *See Home Depot*, 131 F. Supp. 2d at 937. Here, Claimants have not produced any documentation for the Court to find that traveling to Michigan would pose a significant financial hardship. Therefore, the Court does not place great weight on this consideration.

Claimants also argue that their counsel is located in California. Dkt. No. 18, p. 14 (Pg. ID No. 261). This fact does not weigh in favor of transfer because convenience of counsel is not a factor to be considered when ruling on motion for transfer. *See Solomon v. Cont'l Am. Life Ins. Co.*, 472 F.2d 1043, 1047 (3d Cir. 1973) ("The convenience of counsel is not a factor to be considered."); *In re Volkswagen AG*, 371 F.3d 201, 206 (5th Cir. 2004) ("The word 'counsel' does not appear anywhere in § 1404(a), and the convenience of counsel is not a factor to be assessed in determining whether to transfer a case under § 1404(a)."). Although the Sixth Circuit has not yet enunciated this rule, this rule is sensible and observed by circuit and district courts nationwide—including this district—so the Court will

follow it. *See Cincinnati Ins. Co. v. O'Leary Paint Co.*, 676 F. Supp. 2d 623, 633 (W.D. Mich. 2009) (collecting cases); *Hite v. Norwegian Caribbean Lines*, 551 F. Supp. 390, 395 (E.D. Mich. 1982) ("[T]he convenience of counsel is not a relevant factor under 28 U.S.C. § 1404(a).").

### c.  Ease of Access to Sources of Proof

Third, the Court considers the relative ease of access to sources of proof. *See Grand Kensington*, 81 F. Supp. 2d at 836. Claimants assert that any sources of proof could be transferred electronically, but does not specifically identify any sources of proof to demonstrate convertibility to electronic means. *See* Dkt. 18, p. 15 (Pg. ID No. 262). Accordingly, given the lack of evidence presented by either party on this issue, the Court does not find that this factor weighs in favor of or against transfer.

### d.  Availability of Process to Compel Attendance of Unwilling Witnesses

Fourth, the Court considers the availability of process to compel the attendance of unwilling witnesses. *See Grand Kensington*, 81 F. Supp. 2d at 836. As neither party has alleged that there are unwilling witnesses in the present case, the Court does not find that this factor should be considered in the present balancing.

### e.  Cost of Obtaining Willing Witnesses

Fifth, the Court considers the cost of obtaining willing witnesses. *See Grand Kensington*, 81 F. Supp. 2d at 836. Neither party has made arguments specifically on this point, and the Court addressed monetary considerations in the witness convenience section above. Accordingly, this factor does not weigh in favor of or against transfer.

### f.  Efficiency and Expense

Sixth, the Court considers where the case can be tried more expeditiously and inexpensively. *See Grand Kensington*, 81 F. Supp. 2d at 836. Claimants argue that efficiency would be favored by a transfer to the Central District of California because the average resolution time in that district is 19.8 months, compared to 29.6 months in the Eastern District of Michigan. Dkt. No. 18, p. 16 (Pg. ID No. 263). It is notable that in this case, Claimants delayed case progression by more than six months by seeking, and receiving, four separate extensions to file a response. *See* Dkt. No. 4–11. It was only after the Court refused to grant any further extensions did Claimants finally file an answer in October 2016. *See* Dkt. No. 11, 14. The Court does not believe that parties should be incentivized into creating extended delays to buttress support for motions to transfer. Accordingly, this factor should not weigh in favor of transfer.

-18-

### g.  Interests of Justice

Seventh, the Court considers the interests of justice, which includes whether the administration of justice will be advanced by a transfer. *See Grand Kensington*, 81 F. Supp. 2d at 836. Both districts are familiar with and capable of deciding the issues and law presented in this case.

Additionally, the Governments choice of forum is a significant factor when balancing the parties' interests. *Van Dusen*, 376 U.S. at 633–34. Specifically, the Government has an interest in trying this case where the acts giving rise to forfeiture occurred and where its witnesses are located. Although Claimants reside in California, and trying the case in Michigan may cause them some inconvenience, the balance of interests does not strongly weigh in their favor. In sum, they have not overcome the presumption afforded in favor of a plaintiff's choice of forum.

Accordingly, Claimants' Motion for Change of Venue [18] is **DENIED**.

## C. Claimants' Motion for a Protective Order

In Claimants' second motion, they seek a protective order pursuant to Rule 26 of the Federal Rules of Civil Procedure. Dkt. No. 17.

Under Rule 26(c), the party seeking a protective order bears the burden of persuasion. *See Lewis v. St. Luke's Hosp. Ass'n*, 132 F.3d 33, at *4 (6th Cir. 1997) (unpublished); *Waelde v. Merck, Sharp & Dohme*, 94 F.R.D. 27, 28 (E.D. Mich.

-19-

1981). The moving party must show good cause by demonstrating a particular need for protection. *Lewis*, 132 F.3d at *4. "Broad allegations of harm unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id*. (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)).

In a forfeiture proceeding, the Government may commence limited discovery immediately after a verified claim is filed. Supplemental Rule G(6)(a) provides that "[t]he government may serve special interrogatories limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." The purpose of the rule is "to permit the government to file limited interrogatories at any time after the claim is filed to gather information that bears on the claimant's standing." Supp. R. G advisory committee's note (subdivision (6)). The claimant must respond to these special interrogatories within 21 days. Supp. R. G(6)(b). The general civil discovery rules of the Federal Rules of Civil Procedure otherwise apply. Supp. R. G(1).

In the present case, Claimants present only a broad allegation of possible harm, lacking the particularity that must be shown for the issuance of a protective order. Claimants allege that the Government seeks to use information from the Interrogatories to develop other charges, citing to the Government's response brief. Dkt. No. 26, p. 7 (Pg. ID No. 485). However, Claimants have not specified what

harm they will experience in the absence of a protective order. Accordingly, Claimants have not demonstrated a particular need for protection.

Furthermore, Rule 5.2 of the Federal Rules of Civil Procedure already protects much of what Claimants argue must be covered by a protective order. FED. R. CIV. P. 5.2(a) (requiring the following information to be redacted from filings before the Court: (1) the last four digits of the social-security number and taxpayer-identification number; (2) the year of the individual's birth; (3) the minor's initials; and (4) the last four digits of the financial-account number.).

Having reviewed the Supplemental Rules and the Government's Interrogatories, the Court finds that the Interrogatories served upon Claimants fall sufficiently within Supplemental Rule G(6)'s requirement that such interrogatories be "limited to the claimant's identity and relationship to the defendant property." Supp. R. G(6)(a).

## V. CONCLUSION

For the reasons stated herein, the Court will **DENY** Claimants' Motion to Transfer Venue [18] and **DENY** Claimants' Motion for a Protective Order [17].

IT IS SO ORDERED.

Dated:        December 20, 2016

                                        /s/Gershwin A Drain
                                        HON. GERSHWIN A. DRAIN
                                        United States District Court Judge